AO 91 (Rev. 11/82)                               **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA FILED CLERK, U.S. DISTRICT COURT |
|---|---|
| UNITED STATES OF AMERICA v. DAVID ECCLESTON, LESLIE CHARLES BONNER, ALEXANDER NEMBHARD, DEVON ANTONY MALCOLM, MICHAEL MCNEAL, and LUIS LOPEZ | DOCKET NO. JUL 2 4 2019 CENTRAL DISTRICT OF CALIFORNIA BY DEPUTY |
| | MAGISTRATE'S CASE NO. 19MJ 03038 |

Complaint for violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(A)(ii)

| NAME OF MAGISTRATE JUDGE HONORABLE ALEXANDER F. MACKINNON | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE Date unknown through July 5, 2019 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(ii)]

Beginning on a date unknown and continuing to on or about July 5, 2019, in Los Angeles County, California, within the Central District of California, and elsewhere, defendants DAVID ECCLESTON, LESLIE CHARLES BONNER, ALEXANDER NEMBHARD, DEVON ANTONY MALCOLM, MICHAEL MCNEAL, and LUIS LOPEZ conspired to knowingly possess with the intent to distribute and to distribute at least 5 kilograms of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(A)(ii).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **GEOFFREY WORTH** /S/ |
|---|---|
| | OFFICIAL TITLE Special Agent – FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) **ALEXANDER F. MacKINNON** | DATE July 24, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Michael G. Freedman X0631          REC: Detention

## AFFIDAVIT

I, GEOFFREY WORTH, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for the following individuals for a  violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), conspiracy to possess with intent to distribute and to distribute cocaine:

       a.    David ECCLESTON("ECCLESTON");

       b.    Leslie Charles BONNER ("BONNER");

       c.    Alexander NEMBHARD, aka DON-G ("NEMBHARD" or "DON-G");

       d.    Devon Antony MALCOLM ("MALCOLM");

       e.    Michael MCNEAL ("MCNEAL"); and

       f.    Luis LOPEZ ("LOPEZ").

2.    This affidavit is also made in support of an application for a warrant to search the following locations:

       a.    9350 7th Street Unit D, Rancho Cucamonga, CA 91730 (the "FACTORY") as further described in Attachment A-1, which is incorporated herein by reference;

       b.    17304 Maurice Ave, Cerritos, CA 90703 ("ECCLESTON'S HOUSE," and, together with the FACTORY, the "SUBJECT PREMISES") as further described in Attachment A-2, which is incorporated herein by reference;

c.    The person of David ECCLESTON ("ECCLESTON"), as further described in Attachment A-3, which is incorporated herein by reference;

d.    The person of Leslie Charles BONNER ("BONNER"), as further described in Attachment A-4, which is incorporated herein by reference;

e.    The person of Alexander NEMBHARD ("NEMBHARD") as further described in Attachment A-5, which is incorporated herein by reference;

f.    The person of Devon Antony MALCOLM ("MALCOLM") , as further described in Attachment A-6, which is incorporated herein by reference; and

g.    The person of Luis LOPEZ ("LOPEZ"), as further described in Attachment A-7, which is incorporated herein by reference.

3.    The requested search warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 843(b) (Unlawful Use of a Communication Facility (including the mails) to facilitate the Distribution of a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense), and 18 U.S.C. § 1956 (Money Laundering) (collectively, the "SUBJECT OFFENSES"), as more fully described in Attachment B, respectively, which are incorporated herein by reference.

2

Instrumentality Protocol

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR SPECIAL AGENT WORTH

5.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed in this capacity since 1997. I am currently assigned to a Criminal Enterprise Squad at the Los Angeles Field Office of the FBI, specifically the Los Angeles High Intensity Drug Trafficking Area ("LA HIDTA"), Southern California Drug Task Force ("SCDTF"). The SCDTF is comprised of agents and officers from federal, state, and local law enforcement agencies, primarily assigned to investigate large-scale narcotics trafficking.

6.   During the course of my 20 years of employment with the FBI, I have received a variety of training related to the conduct of investigations of criminal enterprises, including approximately 16 weeks of training at the FBI Academy in Quantico and additional, more specialized trainings during the course of my career.

7.   I have participated in a variety of complex conspiracies involving the narcotics trafficking activities of

3

Instrumentality Protocol

various criminal enterprises. I have arrested and interviewed subjects, executed search warrants, conducted physical surveillances, utilized electronic and video surveillance, spoken to informants, suspects, and other experienced narcotics investigators concerning the methods and practices utilized by narcotics traffickers and testified in federal court.

8.    As an FBI Special Agent, I have participated in numerous narcotics investigations as a case agent and in a subsidiary role. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with the methods of operation that narcotics traffickers utilize, including the distribution, storage, and transportation of narcotics and the collection of narcotic related proceeds from drug trafficking and various methods of money laundering used to conceal the nature of the proceeds. Additionally, I have participated in many aspects of drug investigations alongside experienced senior SAs and TFOs. These investigations involved: unlawful importation, possession with intent to distribute and distribution of drugs, laundering of drug proceeds and monetary instruments derived from drug activities and conspiracies associated with drug offenses.

9.    Based on my training and experience, I am familiar with the methods of operation used for the distribution, storage and transportation of controlled substances, as well as the collection of proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.

Instrumentality Protocol

### III. SUMMARY OF PROBABLE CAUSE

10.   For over a year, agents have been investigating a drug trafficking organization run in Los Angeles by David ECCLESTON ("ECCLESTON").  ECCLESTON, operating in part out of the FACTORY, ships multi-kilogram quantities of cocaine from Los Angeles across the country, including to Michael MCNEAL ("MCNEAL") in Philadelphia.  Some of the shipments are conducted through City Business Shipping in Los Angeles, where Luis LOPEZ ("LOPEZ") assists ECCLESTON with the shipments and tracking the shipments. Based on intercepted communications pursuant to court orders and surveillance, agents have also identified ALEXANDER NEMBHARD ("NEMBHARD" or "DON-G "[1]), Leslie Charles BONNER ("BONNER"), and Devon Antony MALCOLM ("MALCOLM") as associates of ECCLESTON's who assist with shipping drugs from Los Angeles and coordinating the delivery of cash narcotic proceeds back to Los Angeles. Numerous such shipments and deliveries, including several that led to large seizures, are described in detail below.

### IV. STATEMENT OF PROBABLE CAUSE

11.   Based on my review of law enforcement reports, intercepted communications, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

---

[1] NEMBHARD is also referred to as DON-G throughout this affidavit because he was only recently identified as NEMBHARD, as described below.

Instrumentality Protocol

### A. June 27, 2018: Seizure of 64 Kilograms of Cocaine and Fentanyl and $955,884

12. On June 27, 2018, members of the Inland Regional Narcotics Enforcement Team ("IRNET") were conducting surveillance of Aldrin Alonso GASTELLUM-FLORES ("GASTELLUM-FLORES") in the course of an ongoing investigation into a Mexican Drug Trafficking Organization operating in and around the Inland Empire area of California located east of Los Angeles. GASTELLUM-FLORES drove a Dodge van (the "Dodge van") to pick up Jose Louis CORRAL ("CORRAL"), and the two then drove to a house at 313 Bradenhall Drive ("313 Bradenhall") in Carson, California and pulled into the garage.

13. Approximately two hours later, the Dodge van backed out of the driveway, with GASTELLUM-FLORES and CORRAL inside, and IRNET officers detained the Dodge van and sought a search warrant for 313 Bradenhall and the Dodge van and other vehicles at the location, believing they had observed an exchange of drugs for money at 313 Bradenhall. As they did so, they saw two black men, later identified as ECCLESTON and MALCOLM, running from the house. Officers arrested ECCLESTON and MALCOLM.

14. MALCOLM presented a fraudulent Canadian Driver's License in the name of Mark A. Martin to the arresting officers. A fingerprint comparison was performed and identified Martin as MALCOLM. I compared a photograph of an alien removed, contained in Department of Homeland Security, Homeland Security Investigations (HSI) records for MALCOLM and observed that it matched the June 27, 2018 arrest photograph of Mark A. Martin.

Instrumentality Protocol

15.   ECCLESTON presented a Florida driver's license in the name of Dennis Benjamin.  Agents know that ECCLESTON has previously used that alias and have confirmed that the photograph on the Dennis Benjamin license is a photograph of ECCLESTON.

16.   IRNET officers obtained a California state search warrant for the 313 Bradenhall house and associated cars, including the Dodge van.  Pursuant to the warrant, officers seized $955,884 and approximately 64 kilograms of suspected narcotics from the residence.  The narcotics were tested by San Bernardino County Sheriff's Department, Scientific Investigations Division and confirmed to contain fentanyl and cocaine.

**B.    February 25, 2019: Seizure of 11 Kilograms of Cocaine**

17.   On February 25, 2019, at 7:12 a.m., ECCLESTON sent DON-G a text message that contained 3 addresses in Charleston, South Carolina.[2]

18.   On February 25, 2019, at 7:13 a.m., ECCLESTON called CARLTON EDWARDS ("EDWARDS"), who agents know is a drug trafficking associate of ECCLESTON'S in South Carolina, and asked EDWARDS if he was going to have an individual referred to

_____

[2] The wire and electronic communications described in this affidavit were intercepted pursuant to federal court orders. Specifically, on January 10, 2019, the Honorable Dale S. Fischer, United States District Judge, Central District of California, authorized the interception of wire communications occurring over a telephone number used by ECCLESTON in case number 19-CM-00021-DSF.  On February 13, 2019, Judge Fischer authorized the continued interception of wire communications and the initial interception of electronic communications over the same telephone number used by ECCLESTON in 19-CM-00021(A)-DSF.

Instrumentality Protocol

as FAMILY send him one?  EDWARDS said yes. ECCLESTON said FAMILY had not sent it to him yet.

19.  On February 25, 2019, at 7:16 a.m., DON-G called ECCLESTON and DON-G asked if it "was only three of them," to which ECCLESTON replied that he was going to send one more. DON-G asked ECCLESTON if it was "Mr. X" and ECCLESTON replied, yes, "X next")

20.  On February 25, 2019, at 7:21 a.m., ECCLESTON received two text messages from FAMILY.  The first text message provided an address in North Charleston, South Carolina and the second text message read: "Fam."

21.  On February 25, 2019, at 7:22 a.m., ECCLESTON called FAMILY to confirm that ECCLESTON had received the address FAMILY had texted him.  ECCLESTON told FAMILY he would "jump on it today."

22.  Based on these communications, agents conducted surveillance of DON-G on February 25, 2019 and saw DON-G drive a Nissan sedan (the "Nissan") to a shipping store in Rancho Cucamonga, California called JNC Shipping and Wireless ("JNC Shipping").  DON-G went into the store and came out with what appeared to be shipping labels.  Shortly thereafter, DON-G's Nissan was parked at the FACTORY.  Agents then saw DON-G leave the FACTORY with two cardboard boxes, place them in the Nissan's trunk, and then go retrieve two more cardboard boxes from the FACTORY and place those two in the Nissan's trunk as well.

23.  DON-G left the FACTORY in the Nissan at approximately 1:00 p.m. and drove to a FedEx shipping location and then on to

Instrumentality Protocol

a second a FedEx shipping location.  After DON-G left the second
FedEx shipping location, at approximately 1:40 p.m., agents
entered the location and saw two boxes that looked like the
boxes they had seen DON-G carry out of the FACTORY earlier that
day.  The boxes were addressed to locations in South Carolina.

24.  On February 25, 2019 at 1:44 p.m., ECCLESTON called
FAMILY twice but FAMILY did not answer.

25.  On February 25, 2019 at 1:45 p.m., FAMILY called
ECCLESTON and ECCLESTON told FAMILY he had sent FAMILY something
and asked if FAMILY had seen it.  FAMILY said he would check
right then.  At 1:46 p.m., FAMILY called ECCLESTON and told
ECCLESTON he had received what ECCLESTON had sent.

26.  On February 25, 2019, at 2:00 p.m., ECCLESTON received
a call from an individual in South Carolina known as Michael
HUBBART ("HUBBART") and ECCLESTON told HUBBART "Um, I send three
things to you. Did you see that?"  HUBBART replied, "Yeah, I got
'em." ECCLESTON stated "Alright. Look, check them and make sure
they are ok. Ok?" HUBBART agreed, "I got 'ya."

27.  On February 25, 2019, at 2:01 p.m., HUBBART sent
ECCLESTON a text message that read "Yeah, they good to go" to
ECCLESTON's phone.  ECCLESTON responded with a text message that
read "Kool".

28.  Agents took the four addresses in South Carolina that
ECCLESTON had received via text message and ran searches for
corresponding FedEx shipments.  Agents located the four packages
and they were intercepted at the FedEx sorting facility located
in Memphis, Tennessee on February 26 and 27, 2019, and forwarded

Instrumentality Protocol

to agents in Charleston, South Carolina. On February 28, 2019, agents received the four parcels in Charleston, South Carolina. On March 1, 2019, search warrants for the parcels were issued in United States District Court, District of South Carolina. Following the execution of the warrants agents recovered 3 kilograms of cocaine from each of three parcels and 2 kilograms of cocaine from the fourth parcel, totaling 11 kilograms.  A field test of the drugs was performed by agents in South Carolina and results were positive for cocaine.

   **C.   March 1, 2019: Shipment of 44 Kilograms of Cocaine**

   29.  On March 1, 2019, at approximately 9:08 a.m., ECCLESTON called MCNEAL. During the call, MCNEAL told ECCLESTON that he was on his way "there," and gave ECCLESTON his full name.

   30.  At approximately 9:09 a.m., ECCLESTON called LOPEZ[3] and told LOPEZ that MCNEAL "was in the area where it's at." ECCLESTON told LOPEZ to make the necessary arrangements to authorize MCNEAL to pick up the shipment by providing him with MCNEAL's full name.

   31.  LOPEZ called ECCLESTON and told ECCLESTON it was good to go and all that would be needed would be a valid I.D. along

_____

   [3] Agents had identified LOPEZ based on intercepted communications with ECCLESTON beginning in approximately January 2019 and determined in that he works at City Business Shipping Inc. ("City Business Shipping") in Los Angeles.  For example, on February 6, 2019, agents saw LOPEZ at City Business Shipping and then saw ECCLESTON arrive at City Business Shipping and take several boxes inside.  Agents interviewed LOPEZ near City Business Shipping on April 17, 2019.  LOPEZ told agents City Business Shipping had shipped for ECCLESTON "quite a few times."

with the tracking number and then it could be picked up. ECCLESTON thanked LOPEZ.

32. MCNEAL called ECCLESTON from the holding facility and said they had not received any notification via email allowing pickup from LOPEZ and City Business Shipping. MCNEAL said he would give ECCLESTON the correct email at XPO Logistics so ECCLESTON could give it to LOPEZ. MCNEAL said he would text it to ECCLESTON.

33. At 12:41 p.m., MCNEAL sent ECCLESTON a text message that read Carla.paul@xpo.com. Immediately thereafter, MCNEAL sent ECCLESTON another text message that read "And my name Michael McNeal." ECCLESTON sent LOPEZ a text message that read "Carla.paul@xpo.com."

34. ECCLESTON called LOPEZ to verify that LOPEZ had received the email address and asked LOPEZ if LOPEZ had sent it out. LOPEZ said he had his guys at City Business Shipping on it and they had already sent it out. ECCLESTON told LOPEZ it needed to be done because MCNEAL was waiting at XPO Logistics.

35. Agents obtained records from XPO Logistics, which show that at approximately 3:49 p.m. (E.S.T.) XPO Logistics received an email sent from Alberto Martinez at beto94cbs3@gmail.com to Carla Paul at Carla.Paul@xpo.com. The Subject line of the email states: Pro 693555192. The body of the email states the following: "Hi Carla. I am from City Business Shipping my customer would like to pick up the skid if you could please release to Valley & Repair aatn:Michael McNeil. Thank you for your time, Alberto Martinez, City Business Shipping 1147 S. San

11

Pedro St. Los Angeles CA 90015 Tel:323-831-2022 Fax:323-831-2024
www.cbshipping.com"

36. At approximately 3:15 p.m., MCNEAL sent ECCLESTON a
text message that read "got it" and ECCLESTON responded with a
text message that read "ok."

37. At approximately 5:17 p.m., ECCLESTON called MCNEAL
and asked MCNEAL if he was back home already.  MCNEAL said he
was an hour away from home and had picked up the shipment.

38. At approximately 6:56 p.m. ECCLESTON called MCNEAL and
told MCNEAL that of the 44 MCNEAL received in the shipment,
MCNEAL should provide 6 to CUZ, later identified as Dave Elory
ECCLESTON.  MCNEAL and ECCLESTON also discussed a future
shipment ECCLESTON would send to MCNEAL and ECCLESTON said the
next shipment would be "probably 40."

**D.   March 4, 2019: Seizure of 38 Kilograms of Cocaine**

39. On March 4, 2019, at approximately 8:53 a.m., LOPEZ
called ECCLESTON and told ECCLESTON he would be at work around
10:00 a.m. or 10:30 a.m.  ECCLESTON said "alright, I'll be
there."

40. Agents established surveillance at City Business
Shipping and saw ECCLESTON arrived in black BMW (the "Black
BMW") that they had previously seen ECCLESTON driving.
ECCLESTON parked directly in front of City Business Shipping,
went into the store, and came out with LOPEZ.  ECCLESTON and
LOPEZ then removed seven cardboard boxes from the trunk of
ECCLESTON's black BMW and put them on a hand cart that LOPEZ
then wheeled into City Business Shipping.  ECCLESTON walked into

12

Instrumentality Protocol

City Business Shipping as well and then left and drove off in his black BMW.

41. At approximately 11:00 a.m., officers and investigators from the Orange County (OC) Regional Narcotics Suppression Program ("RNSP") entered City Business Shipping and spoke with LOPEZ, who identified himself as the manager of City Business Shipping. LOPEZ contacted the owner of City Business Shipping and the owner gave RNSP consent to have a narcotic-detecting canine team sniff the area inside of City Business Shipping.

42. At approximately 12:00 p.m., the narcotic-detecting canine team positively alerted to the presence of narcotics on the seven boxes that ECCLESTON had dropped off with LOPEZ, and RNSP seized the boxes.

43. At approximately 12:42 p.m., after RNSP left, LOPEZ called ECCLESTON and told ECLLESTON "they took your merchandise." ECCLESTON asked "who" and LOPEZ replied, "I guess it's narcotics . . . so I was just calling to tell you because they got all the information, my cell phone and everything."

44. At approximately 12:46 p.m., ECCLESTON called LOPEZ and asked if they left any paperwork for the boxes they took. LOPEZ replied, "yes... a paper that says 'Orange County Sheriff's Department, Property Receipt.' They left a paper saying what they took like the boxes and a bill of lading that shows the receiving address." ECCLESTON asked LOPEZ to send him a picture of the receipt, and LOPEZ said he would send it through a new phone, "cause my phone – I don't want to use it.".

13

Instrumentality Protocol

45.   At approximately 1:10 p.m., ECCLESTON called BONNER and told BONNER he "needs to be seated to hear this" and they agreed to meet in person.

46.   On March 4, 2019, at approximately 1:40 p.m., the Honorable Margaret M. Bernal, Judge of the Superior Court of California, County of Los Angeles, signed a search warrant for the seven boxes seized.  RSNP then conducted a search resulting in the recovery of 38 bricks, each weighing approximately one kilogram, of suspected cocaine, from the seven seized boxes. The narcotics were tested and confirmed to contain cocaine.

### E.   May 2019: Seizure of 38 Kilograms of Cocaine

47.   On May 6, 2019, agents conducted surveillance at the FACTORY and saw a large wooden crate being unloaded from a large delivery truck and moved into the FACTORY, by BONNER and DON-G. [4] Shortly thereafter, ECCLESTON arrived and went into the FACTORY. ECCLESTON remained inside the FACTORY for approximately 20 minutes before emerging with a dark duffel bag that he put into the trunk of his car and then drove away.

---

[4] Based on intercepted calls, agents know that BONNER has previously rented trucks and driven them to the FACTORY.  For example, on February 19, 2019, ECCLESTON called BONNER at approximately 1:23 p.m. and asked BONNER "if he could rent one of the Home Depot trucks."  At approximately 4:49 p.m., agents saw BONNER arrive at the FACTORY in a U-Haul van.  Upon further investigation, agents determined that Rene Karla HOLLINS ("HOLLINS") had rented the U-Haul van and had also signed a delivery receipt and a form required for Dock Pick Up of a large crate, believed to contain bulk cash from MCNEAL, addressed to RAC Window Treatments from Valley Repairs that same day. Shortly after BONNER arrived at the FACTORY in the U-Haul van, ECCLESTON arrived at the FACTORY.  At approximately 5:31 p.m., ECCLESTON called DON-G and said that "he said to meet him at the U-Haul from Foothills and Archibald… return a truck"

14

48. Agents identified Estes Express Lines as the owner of the large delivery truck. Estes Express Lines provided records for the delivery indicating that on April 26, 2019, M. MCNEAL, VALLEY REPAIR & SALES, 94 WALNUT STREET, COLWYN, PA 19023 shipped "Car Parts" weighing 355 pounds to RAC WINDOW TREATMENTS, 9350 7th Street, Unit D, Rancho Cucamonga, CA, 91730, the address of the FACTORY.

49. On May 7, 2019, agents saw ECCLESTON at the FACTORY, removing shipping and packaging supplies from his vehicle and entering the FACTORY. Agents then observed Michael MCNEAL and another man identified as BURROWS arrive at The FACTORY, in a Black Cadillac Escalade determined to be rented from Hertz by MCNEAL. The two men exited the vehicle and entered the front door of The FACTORY.  Shortly thereafter ECCLESTON, MCNEAL and BURROWS exited the FACTORY entered their vehicles and departed.

50. On or about May 16, 2019, agents identified a shipment originating from RAC Window Treatments, Golden West Business Park, 9350 7th Street, Unit D, Rancho Cucamonga, CA, 91730, the addressed of the FACTORY, destined for Valley Repair & Sales, 94 Walnut Street, Colwyn, Pennsylvania 19023.

51. Agents determined that Old Dominion Freight Line, located at 1225 W. Washington Boulevard, Montebello, California, had received a 355 pound crate dropped off at its dock on May 13, 2019, by an individual who presented a Pennsylvania driver's license in the name of Michael MCNEAL as identification.  MCNEAL declared the shipper of the crate to be RAC Window Treatments, 9350 7th St. Suite D, Rancho Cucamonga, CA 91438. The bill of

Instrumentality Protocol

lading lists the consignee as Valley Repair and Sales located at 94 Walnut St., Colwyn, Pennsylvania 19023 and indicates the shipment is to be billed to Valley Repair and Sales, 94 Walnut St. Colwyn, Pennsylvania 19023. The contents of the crate are described as auto parts and the bill of lading is signed by "M McNeal" with an expected delivery date of May 20, 2019.

52. Once identified, Philadelphia agents caused the shipment to be seized in Delaware while in transit from Los Angeles to Philadelphia. On May 17, 2019, the Honorable Mary Pat Thynge, United States Magistrate Judge for the District of Delaware, issued a warrant in case number 19-157M for a search of the shipping crate. Upon execution of the warrant, Philadelphia agents recovered 38 kilograms of cocaine from the shipping crate. A field test of the drugs was performed by agents in Philadelphia and results were positive for cocaine.

**F.   June 10, 2019: Seizure of $72,500**

53. On June 10, 2019, agents in Charleston, South Carolina saw EDWARDS, a known associate of ECCLESTON, meet with Joe JEFFERSON ("JEFFERSON") at a hotel. EDWARDS and JEFFERSON then went to a Walmart store and purchased new cardboard shipping boxes, spray foam, and packing tape before returning to the hotel. Approximately one hour later, JEFFERSON left the hotel and EDWARDS traveled to a Staples store and obtained additional cardboard shipping boxes before returning to the hotel. JEFFERSON then departed the hotel and traveled to a FedEx Office store and entered with a brown box in his hand. JEFFERSON was observed shipping the parcel.

16

Instrumentality Protocol

54. Approximately one hour later, EDWARDS was observed meeting with Mathew JAMES ("JAMES") at the hotel. JAMES and EDWARDS traveled to the same FedEx Office, and EDWARDS retrieved multiple empty FedEx boxes. EDWARDS and JAMES traveled to JAMES' residence before returning to the same FedEx Office store. JAMES was observed entering the store with a white FedEx box and shipping the parcel. After both parcels were turned over to FedEx for shipment, agents intercepted the following parcels and determined that both were addressed to Mark Mumble, which agents know is an alias for MALCOLM, at JNC Shipping and Office Supplies, which is where DON-G mailed the four parcels in February that were found to contain cocaine, as described above.

55. On June 12, 2019, search warrants were obtained in United States District Court, District of South Carolina for the two parcels. Upon executing the search warrants, agents discovered $46,050 shipped by JEFFERSON and $26,000 in the parcel shipped by JAMES.

**G. July 5, 2019: Seizure of $514,379**

56. On July 5, 2019, agents in Philadelphia investigating MCNEAL and others, determined that MCNEAL was traveling from Philadelphia to Los Angeles. Agents believed that MCNEAL had with him a large sum of drug proceeds.

57. At approximately 5:15 p.m., MCNEAL was observed by law enforcement officers in the passenger seat of a 2012 Kenworth tractor trailer bearing Indiana tag 2742773 on Interstate 44 near Stroud, Oklahoma. The Oklahoma Highway Patrol ("OHP") executed a probable cause traffic stop on the tractor

17

trailer. During the traffic stop, OHP troopers identified the driver of the tractor trailer as Terence Lee SMITH ("SMITH") and the passenger as MCNEAL.  Agents know that SMITH was seen meeting with ECCLESTON on April 23, 2018 near Los Angeles International Airport, where agents have seen ECCLESTON repeatedly meet bulk cash couriers.

58.  OHP troopers deployed a narcotics-detecting canine, who alerted to the odor of narcotics on the tractor trailer. OHP troopers conducted a probable cause search of the cab of the tractor trailer and found a red suitcase containing large bundles of cash wrapped in food saver wrapping.  MCNEAL said the cash was his and he was travelling to California to buy a yacht. MCNEAL and SMITH both signed disclaimers as to the cash, which was seized and determined to be approximately $514,379.

**H.   Additional Investigation Regarding the FACTORY.**

59.  On January 26, 2019, ECCLESTON called DON-G and told DON-G "me 'der, me 'der, rollin out 'der – the FACTORY" and asked DON-G to meet him there with a key.  Later that day, cell phone tracking data indicated that a telephone used by ECCLESTON was at the FACTORY, and a white Mercedes ECCLESTON has been seen driving was seen parked in front of the FACTORY.  Two other cars were also seen parked at the FACTORY at the same time: a white BMW SUV, later identified as operated by BONNER and registered to Rene Karla HOLLINS ("HOLLINS"), and a silver Nissan, later identified as operated by DON-G.

60.  At this time, there was no signage on the FACTORY indicating any business or activity associated with the

Instrumentality Protocol

location.  Agents later observed that signage in the name of
"RAC Window Treatments" was placed near the front entrance to
Unit D.  To date in this investigation, agents have not observed
any activity indicating a legitimate business under the name of
RAC Window Treatments is being conducted from "The FACTORY".

61.  Business records obtained from freight shipping
companies have connected RAC Window Treatments to Valley Repairs
at 94 Walnut St. Darby, PA 19023 an automotive repair business
owned and operated by Michael MCNEAL in Philadelphia on several
occasions.

I.  **Additional Investigation of ECCLESTON's HOUSE.**

62.  On June 24, 2019, based on court ordered "pings" of
ECCLESTON's cell phone, TFO Woodard conducted a location check
in the vicinity of Maurice Avenue in the city of Cerritos, CA.
Previous phone pings indicated that ECCLESTON had possibly
relocated to a single family home located at 17304 Maurice
Avenue ("ECCLESTON'S HOUSE").

63.  At approximately 4:00 p.m., TFO Woodard observed
ECCLESTON enter the neighborhood driving a black 2016 Honda
sedan. ECCLESTON parked in the driveway of ECCLESTON'S HOUSE,
exited the vehicle, unlocked the front door and went inside the
residence.

64.  On July 19, 2019, based on phone pings, TFO Woodard
conducted an address check at ECCLESTON'S HOUSE at approximately
7:00 p.m., and observed ECCLESTON's black Honda parked in the
driveway.  Additionally, the phone continued to ping at the same

19

residence on the nights of July 21-22, 2019 indicating that
ECCLESTON is currently residing at ECCLESTON'S HOUSE.

65.   On July 22, 2019, based on phone pings, TFO Woodard
conducted an address check at ECCLESTON'S HOUSE at approximately
11:00 a.m. and observed ECCLESTON's black Honda parked in the
driveway. No other individuals have been observed at the
location.

J.   **Identification of BONNER and NEMBHARD**

66.   On July 10, 2019, agents saw at the FACTORY a white
BMW SUV and a silver Nissan sedan they had seen at the FACTORY
on numerous prior occasions.  DON-G was driving the Nissan, and
BONNER was a passenger.  BONNER got out of the Nissan and got
into the BMW.

67.   On July 15, 2019, agents conducted surveillance of
BONNER in the white BMW SUV, and San Bernardino Police
Department conducted a vehicle stop on the white BMW SUV.  The
driver of the BMW provided a Jamaican driver's license with the
name Leslie Charles BONNER.  Based records obtained from
BONNER's Non-Immigrant VISA application I know that a photograph
of Leslie Charles BONNER is the same as the individual agents
observed driving the white BMW SUV on several occasions
including July 15, 2019.

68.   On July 17, 2019, agents were conducting of
surveillance of DON-G, later identified as NEMBHARD, who was
driving the Nissan sedan agents had previously seen him in at
the FACTORY.  Rancho Cucamonga Police Department conducted a
vehicle stop, and DON-G presented a fraudulent Canadian driver's

20

license in the name of Terrence Allen.   DON-G was fingerprinted, and agents searched the fingerprints in law enforcement databases to confirm that DON-G is NEMBHARD.

## V.   TRAINING AND EXPERIENCE REGARDING EVIDENCE ASSOCIATED WITH DRUG TRAFFICKING

69.   Specifically with respect to trafficking organizations involved in the transportation and distribution of illegal drugs, I know based on my training and experience that drug distributors often reside at and store or maintain the following evidence at their residences and/or places of operation:

a.   Drugs, in any form, such as cocaine, methamphetamine, ecstasy, heroin, fentanyl, acid, and prescription drugs;

b.   Paraphernalia for packaging, processing, cutting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, plastic bags, and heat-sealing devices;

c.   Books, records, receipts, notes, ledgers, and other papers relating to the manufacture, distribution, and possession with intent to distribute controlled substances;

d.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture, distribution, and possession with intent to distribute controlled substances and personal property tending to show the existence and/or location of other stored drugs, including, but not limited to,

21

storage locker receipts, maps, safety deposit keys and corresponding records, and money-counting machines;

   e. Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and prepaid debit cards;

   f. Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

   g. Photographs, negatives, video tapes, films, undeveloped film, electronic storage devices and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled substances;

   h. Items of personal property that tend to identify the person(s) in residence, and the occupancy, control, or ownership of the subject premises, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

   i. Devices used to communicate with other individuals involved in the transportation, distribution, and possession with intent to distribute cocaine and other controlled substances, including cellular telephones, mobile telephones, phone answering machines, telephone answering

Instrumentality Protocol

machine tapes, beepers or pagers, and devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing the same; and,

j.    Assigned telephone numbers for telephone and cellular telephones, found on the premises or vehicles, along with telephone toll records, papers, notebooks, and other items, documenting the manufacture, distribution, or possession with intent to distribute cocaine and other controlled substances, and communications among co-conspirators.

k.    Based upon my training and experience, as well as the collective knowledge and experience of other assisting agents, I am aware that it is a common practice for individuals who traffic in illicit drugs to keep records, proceeds from drug transactions, and other evidence at their residences.

l.    Based on my training, I know that records, in particular, are often maintained by drug traffickers.  Based on my training in investigating drug trafficking organizations, I know that drug traffickers tend to keep their records for a long period of time.  Further, because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily

23

ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain records of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

m.   It is also a common practice for drug traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances or items associated with the production of controlled substances. Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking is also often maintained in their residences. Further, drug traffickers often maintain cash hoards at their residences. Cash hoards are used for the purchase of drugs and are the result of the sale of controlled substances. Cash hoards are often stored in secured environments, such as safes and vaults.

n.   Drug traffickers often possess firearms and other dangerous weapons to protect their profits and supply of drugs from others who might attempt to forcibly take the traffickers' profits and supply of drugs.

70.   In a number of searches of residences associated with drug traffickers in prior investigations in which other agents

24

Instrumentality Protocol

and I have been involved, the above-referenced evidence has typically been recovered from residences and other structures and areas on the property being searched, such as storage sheds or parked vehicles on or around the premises.

71. Further, based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug traffickers usually do not voluntarily stop selling drugs and continue to do so until they are stopped by law enforcement.

b. Drug traffickers maintain evidence of their activities (including types of evidence specified above) for long periods of time, in order to track prior transactions and/or maintain account histories.

c. Persons involved in drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, amounts of jewelry, automobiles, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in drug trafficking activities.

d. Drug traffickers maintain drug paraphernalia in much the same way legitimate businesses will maintain their "tools of the trade," whether or not there is contraband on the premises on any given day.

72. I know from my training and experience that drug traffickers often use non-commercial vehicles to transport drugs

25

Instrumentality Protocol

to and from locations.  I also know that non-commercial vehicles are often used to store records of drug transactions and cash proceeds of such transactions.  Such records and cash are often stored in hidden compartments or inside the trunk of such vehicles.

73.  From my background and experience, I know that individuals engaged in illegal income producing businesses seek to conceal the income generated from such businesses.  In particular, individuals engaged in drug trafficking often conduct their transactions in cash to avoid creating bank records related to such transactions.

74.  I am aware that the proceeds generated from both legal and illegal activities may be spent many years after the activity has stopped.  Thus, records reflecting income and expenditures for the time period spanning the activity and those years immediately following the end of this activity are essential to any financial investigation.

75.  Often, the method of drug distribution (when a criminal activity is or has been present) generates records of events as well.  These records can be in the form of bills of lading, contracts, air waybills, delivery receipts, billings, manifests, log books, fuel receipts, motel/hotel receipts, travel records, credit card charges and other related business documents.

76.  Individuals who amass proceeds from legal or illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in

26

Instrumentality Protocol

financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc. I know from personal knowledge that individuals attempting to conceal income from the government often use a variety of methods to conceal the income including creating false business entities, using known and unknowing individuals, and hide assets, in order to disguise and conceal income.

77. I know from my training and experience that individuals involved in drug trafficking will often keep track of cash and other resources by taking photos of such items. Those photos may sometimes be taken or stored on cellular phones. Individuals involved in such illegal activities will often need to keep track of cash and other resources by photos and other personal documentary means because they do not want to deposit funds into a bank account, which would create records of such cash. In addition, I know that individuals involved in such illegal activities will take photos of their drug inventory to document amounts, to provide to potential buyers, and for other personal reasons. I know that such photos may be found on cellular phones of such individuals.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

78. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

27

Instrumentality Protocol

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

Instrumentality Protocol

b.    Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive
could contain as many as approximately 450 full run movies or
450,000 songs.

d.    Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded

Instrumentality Protocol

onto a hard drive, deleted, or viewed via the Internet.[5]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[5] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

Instrumentality Protocol

requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence

31

in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

        g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by

Instrumentality Protocol

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

79. As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  During surveillance, agents have observed ECCLESTON, BONNER, NEMBHARD, MALCOLM, MCNEAL, and LOPEZ utilizing a cellular telephone.  Additionally, I have obtained telephone records for cellular telephones I believe are used by ECCLESTON, BONNER, NEMBHARD, MALCOLM, MCNEAL, and LOPEZ.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock

Instrumentality Protocol

their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these

34

companies have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. To activate the facial-recognition feature, a user must hold the device in front of his or her face. The device's camera analyzes and records data based on the user's facial characteristics. The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d. While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that

35

are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

80.  In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode
or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

36

81. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

82. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of

37

Instrumentality Protocol

the device.  However, in my training and experience, that person

may not be the only user of the device whose physical

characteristics are among those that will unlock the device via

biometric features (such as with Touch ID devices, which can be

registered with up to five fingerprints), and it is also

possible that the person in whose possession the device is found

is not actually a user of that device at all.  Furthermore, in

my training and experience, I know that in some cases it may not

be possible to know with certainty who is the user of a given

device, such as if the device is found in a common area of a

premises without any identifying information on the exterior of

the device.  Thus, it will likely be necessary for law

enforcement to have the ability to require ECCLESTON, BONNER,

NEMBHARD, MALCOLM, MCNEAL, and LOPEZ to unlock the device using

biometric features in the same manner as discussed in the

following paragraph.

83.  For these reasons, if while executing the warrant, law

enforcement personnel encounter a digital device that may be

unlocked using one of the aforementioned biometric features, the

warrant I am applying for would permit law enforcement personnel

to, with respect to ECCLESTON, BONNER, NEMBHARD, MALCOLM,

MCNEAL, and LOPEZ, during the execution of the search and who is

reasonably believed by law enforcement to be a user of a

biometric sensor-enabled device that is (a) located at the place

searched and (b) falls within the scope of the warrant:

(1) compel the use of the person's thumb- and/or fingerprints on

the device(s); and (2) hold the device(s) in front of the face

38

of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

84.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//
//
//
//
/
//
//
//
//
//
//
//
//
//
//

39

Instrumentality Protocol

## VII. <u>CONCLUSION</u>

85.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of the SUBJECT OFFENSES, will be found at the FACTORY, at ECCLESTON'S HOUSE, and on the person of ECCLESTON, BONNER, NEMBHARD MALCOLM, MCNEAL, and LOPEZ.   Additionally, I respectfully submit that there is probable cause to believe that ECCLESTON, BONNER, NEMBHARD, MALCOLM, MCNEAL, and LOPEZ have each committed a violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), conspiracy to possess with intent to distribute and to distribute cocaine

/s/

GEOFFREY WORTH, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 24th day of July, 2019.

ALEXANDER F. MacKINNON

HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE

Instrumentality Protocol